493 A.2d 675

**Harriet HANKIN, Estate of Samuel Hankin, Max Hankin, and Janet Hankin, Appellants,**

v.

**Moe Henry HANKIN, Sabina Hankin, Perch P. Hankin, Gertrude Hankin, Benjamin R. Shanken and Pauline Shanken, Appellees.**

Supreme Court of Pennsylvania.

Argued Jan. 23, 1985.

Decided June 4, 1985.

604

Theodore R. Mann, S. Mark Werner, Sheldon M. Bonovitz, Philadelphia, for appellants.

Franklin Poul, Burt M. Rublin, Philadelphia, for Max & Janet Hankin.

Philip D. Weiss, Norristown, Thomas A. Allen, Philadelphia, for Moe Henry Hankin, Sabina Hankin, Perch P. Hankin, Gertrude Hankin, Benjamin R. Shanken & Pauline Shanken.

Before LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This is the appeal of Harriet Hankin and the Estate of Samuel Hankin (Appellants) from that part of the Opinion and Order of the Superior Court reversing the Order of the Honorable Louis D. Stephan of the Court of Common Pleas of Montgomery County, appointing a receiver to liquidate an estimated $27,000,000.00 in partnership assets. Appellants, together with Moe Henry Hankin [1], Perch P. Hankin, and Pauline Shanken, and their spouses, (Appellees), for

---

1. Moe Henry Hankin has died since the filing of this appeal.

many years operated a family partnership composed of vast real estate holdings. Some of their properties included restaurants, industrial buildings, shopping centers, golf courses, a motel chain, and hundreds of acres of developable ground, estimated to be worth $72,000,000.00 by Moe and Perch Hankin in 1977, (Pages 886a–893a Reproduced Record II). At that time, because of family disagreements and discontent with the management of the partnership, the Hankin family decided to dissolve their partnership. When the Hankins could not agree on how to liquidate the partnership assets, Appellants instituted this equity action in August of 1977, in order to effect a prompt liquidation of the partnership assets.

Six years and three appeals to Superior Court later, Moe Hankin estimated that the remaining unsold property had a value of $27,000,000.00 (Finding Number 6, as amended, Reproduced Record 323a, 324a) and Appellants, for a fourth time, requested the Chancellor to appoint a receiver to oversee liquidation of the remaining property.[2] Appellants argued that since the efforts of Appellees in selling these properties were fruitless, a receiver was necessary to end the liquidation and to insure that a fair price would be received for the remaining properties.

Extensive testimony was taken on the need for appointing a receiver. Appellants introduced evidence which they argued supported their positions that Appellees were taking too long in liquidating the remaining properties and that

2. After filing the liquidation action in 1977, Appellees, as majority owners, were permitted to supervise liquidation. Moe and Perch Hankin were responsible for most of the daily operations of the partnership and convinced the Chancellor that because of their superior knowledge of the partnership's affairs, they should be permitted to act as liquidators for their brothers and sisters. Appellants, as minority owners, have continually felt that their interests were not being adequately protected and requested the appointment of a receiver at least three times. All three times, Superior Court affirmed the Chancellor's decision not to appoint a receiver, (see *Hankin v. Hankin*, 279 Pa.Superior Ct. 179, 420 A.2d 1090 (1980); *Hankin v. Hankin*, 302 Pa.Superior Ct. 295, 448 A.2d 1049 (1981); *Hankin v. Hankin*, 298 Pa.Superior Ct. 559, 442 A.2d 362 (1982)), but was quick to acknowledge that the Chancellor had wide discretion in entering appropriate orders to serve best the interests of all the parties concerned.

because of their delays, a smaller return would be realized by the partners from the sale of the properties. Appellees sought to establish that, given the complexities of liquidating the partnership's considerable holdings, their actions were not excessively slow. The Chancellor resolved this issue against Appellees, finding inter alia, that:

1) Appellees had not aggressively marketed the remaining properties (Finding 16);

2) The reason why aggressive marketing of the remaining properties was not accomplished was that Appellee, Moe Henry Hankin, wished to purchase some of these properties for himself at a substantially lower price ($15,000,000.00) than his own prior asserted value ($24,000,000.00) (Finding 16); and

3) Aggressive marketing by someone other than Appellees could result in a higher return on the sales of the properties than the $15,000,000.00 offered by Moe Henry Hankin and could be accomplished more quickly than Appellees could or would. (Findings 13, 14, 15, 16).

Since Appellees had been given more than a fair amount of time to accomplish liquidation and since a neutral party would be in a better position to obtain a higher return for the parties in liquidating the remaining assets, the Chancellor concluded that a receiver was necessary and appointed one by its Order of April 27, 1983. Appellees filed an appeal from that Order to Superior Court, arguing that the appointment of a receiver was an abuse of discretion. Superior Court agreed and reversed the Chancellor's order, reasoning that without a finding of waste, dissipation of assets, fraud or mismanagement, the appointment of a receiver was an abuse of discretion, 319 Pa.Super. 147, 465 A.2d 1272.

■ Because we perceived Superior Court's Opinion may have imposed an unwarranted restriction on the discretion

exercised by trial courts when appointing receivers in partnership liquidations, we granted allocatur.[3]

■ In cases arising out of the dissolution of a partnership, a court of equity may appoint a receiver to liquidate the partnership, to obtain an accounting of the proceeds and to distribute the assets. *Waddell v. Shriber*, 465 Pa. 20, 348 A.2d 96 (1975). We have indicated, however, that the appointment of a receiver should not be hastily undertaken:

> The power to appoint a receiver is a delicate one, which is jealously safeguarded, and reluctantly exercised, by the courts. The power should be exercised sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief. *Tate v. Philadelphia Transportation Co.*, 410 Pa. 490, 190 A.2d 316 (1963).

Additionally, we have indicated in the past that receivers can be appointed to assure that partnership assets will not be dissipated, *Sellers v. Hanratty*, 343 Pa. 316, 22 A.2d 697 (1941), but where the appointment will work an irreparable injury to the rights and interests of others, where greater injury will probably result from the appointment or where the appointment will do no good, a receiver should not be appointed. *Waddell; McDougall v. Huntingdon and Br. T.R. & C. Co.*, 294 Pa. 108, 143 A. 574 (1928); *Moffett v. Peirce*, 344 Pa. 16, 24 A.2d 448 (1942).

Our decisions leave open the question of what constitutes irreparable injury, as they must, for each case must be evaluated in light of the facts established by the parties, their conduct and the relief necessary to do substantial justice under the circumstances.

The existence of waste or dissipation of assets, or fraud or mismanagement of partnership assets, give cause for the

---

**3.** Appellees' Additional Motion to Dismiss this appeal for mootness will be denied. Sufficient property remains unliquidated so that the need for a receiver may still be appropriate. Additionally, the need to make an accounting and distribution, being within a receiver's jurisdiction, are issues still very much alive.

appointment of a receiver, but we have never indicated that these are the only circumstances that would warrant the appointment of a receiver in partnership liquidation cases. To the extent Superior Court so limited our prior decisions, it erred.

■ Our trial courts, sitting in equity, continue to be vested with wide discretion when partnership liquidation cases are brought before them and are primarily responsible for determining whether a receiver is required. Since the Chancellor hears the evidence and evaluates its credibility, his factual findings must be accorded great weight by appellate tribunals and rarely disturbed.

■ Where substantial evidence supports findings that indicate that a receiver is necessary to preserve the property and the rights of all the parties concerned and to bring about the equitable distribution of the partnership assets by sale of those assets, the Chancellor's exercise of discretion must be affirmed. *Sellers v. Hanratty, Id.*

■ We glean from this record that six years of management of the partnership assets by Appellees has not brought about termination of the liquidation partly becuase Appellee, Moe Henry Hankin, sought to purchase partnership property at a premium price, substantially lower than his own prior asserted valuations. Consequently, as the Chancellor found, the unmistakable conclusion is that Appellees have not aggressively marketed these properties, so that Moe Henry Hankin could purchase them at a premium. The undue delay in winding up the liquidation and repeated attempts by Appellees to keep the buying price of the remainder of these properties as low as possible permeates these entire proceedings and is, in our view, tantamount to waste and a violation of the fiduciary position Messrs. Moe and Perch held as liquidators for *all* the partners.

As liquidators, Moe and Perch Hankin had the responsibility of selling the partnership assets as quickly as possible and for the highest possible price. It was exactly those assurances that the Chancellor relied on in 1977 when he

permitted Messrs. Moe and Perch to act as liquidators for the partnership. Their additional assurances in 1979 that liquidation would be completed within one year again persuaded the Chancellor to permit them to continue as liquidators.

But in 1981, only enough property was sold to retire the debt of the partnership and Appellants again began to complain that Messrs. Moe and Perch were trying to hold on to the properties for themselves.

The Chancellor found as a fact that the sale of the partnership motel chain (George Washington Motor Lodges) was possible only after he permitted Appellants to participate in the negotiations, (Finding 12, 13—Supplemental Record 4a, 5a). The record reveals that in June of 1981, Moe Hankin circulated a letter among all the partners and the Chancellor informing them of an offer by Tollman-Hundley, Inc., to purchase the motel chain for $22,500,-000.00 ($8,000,000.00 in cash and 14.5 million over 10 years) (Supplemental Record 594a–597a). Moe Hankin recommended that the offer be rejected and suggested that any partner should be able to purchase the motel chain for $17,000,000.00 in cash or $20,350,000.00 in a long term payout. From June until September 1981 very little was done to finalize the sale of the motel chain to any party even though Tollman-Hundley, Inc. raised its offer to purchase the motel chain in September 1981. From September to December 1981, a sale had still not been finalized and the Chancellor, in December 1981, authorized a son of Appellant, Samuel Hankins, to enter the negotiations with Tollman-Hundley, Inc. for the sale of the motel chains (Reproduced Record 365a, 383a).

Within ten days a letter of intent was negotiated for the purchase of the motel chain by Tollman-Hundley, Inc., for $25,000,000.00 ($8,000,000.00 in cash, balance payable over eight years). Messrs. Moe and Perch responded to this offer with their own offer to purchase the motels for $23,500,000.00 without a real estate commission (Reproduced Record 415a–416a) and Tollman-Hundley, Inc., with-

drew from the negotiations refusing to participate further in a bidding war. Mr. Hundley expressed his concern to the parties in his letter of January 27, 1982:

"It now seems to me that Tollman-Hundley was used as a bidding and/or appraisal vehicle by the majority Hankins (Moe & Perch) ... We have decided that it is not in our best interest to enter into a bidding contest with any of the sellers and, therefore, we will not make a formal offer on the properties. It appears that no third party has a reasonable chance of success ... (Supplemental Record, 63a).

This game of check and raise ended only when the Chancellor ruled that no inside party could purchase the motels (Reproduced Record, 639a–640a). With Messrs. Moe and Perch forced out of the negotiations as *buyers*, they promptly agreed to sell to Tollman-Hundley, Inc., but for $19,000,000.00 in cash, less commissions. The Court approved this offer and a sale was executed, albeit at a loss of $6,000,000.00 from Tollman-Hundley, Inc.'s, highest offer, but no party appealed the order approving the transaction.

Unreasonable delay in marketing because of Moe Hankin's interest as purchaser also occurred during the sale of the Willow Grove properties. This tract of land, developed with a shopping center, was not to be marketed until groundbreaking occurred. Moe Hankin, however, delayed the marketing another year and a half until part of the shopping center was completed, arguably, to get a better price for the property. At that time he began listing the property for sale at $24,000,000.00 but a few months later, offered to buy this same parcel for $15,000,000.00. The Chancellor rejected this offer and concluded that Moe Hankin was not marketing the properties aggressively and that a receiver would be necessary to market and sell this property and the other remaining properties.

■ Our review of the record satisfies us that substantial evidence exists in this record to support the Chancellor's findings that Moe Hankin was not aggressively marketing the properties because he wished to purchase them at a

premium. Where a partner of a dissolved partnership is charged with the responsibility of selling assets for his fellow partners, his primary responsibility is to obtain the highest possible price for the assets. Once that partner begins to show interest in the properties as a potential buyer, however, he has compromised his duty to his fellow partners in favor of his own interests and it is improper for him to continue to act as fiduciary for his partners, without the full knowledge and consent of all the partners.

It was inappropriate for Moe Hankin to continue to act as a liquidator under the circumstance because his actions as buyer jeopardized all the parties' interests in their partnership assets. If he wished to bid on any parcel, he certainly had the right to do so, but at that point, his ability to fulfill his duty to procure the highest possible price for the parcels was questionable. This conflict of interest as buyer and seller made it impossible for him to continue on as liquidator.

Additionally, the protracted delay in liquidating the properties and making a final distribution must be laid at Moe Hankin's doorstep and the partners were thus denied the ultimate enjoyment of their assets. Already two of the partners have died, eight (8) years have elapsed since the dissolution began, and the partnership still remains unliquidated. This state of affairs justified the appointment of a receiver to market these properties and sell them at the best possible price, as quickly as possible, since Appellees could not or would not do so in a reasonable amount of time. We find no abuse of discretion in the Chancellor's decision to appoint a receiver under the facts of this case.

Superior Court's conclusion that receivers can only be appointed in cases of waste, dissipation, fraud or mismanagement, is drawn from cases where we have been reluctant to harm an *ongoing* business or declare it essentially bankrupt by appointing a receiver. *Northhampton National Bank of Easton v. Piscanio*, 475 Pa. 57, 379 A.2d 870 (1977); *Sellers v. Hanratty*, id.; *McDougall v. Huntingdon and Br. T.R. & C. Co.*, id. These considerations,

however, have no place in this partnership dissolution case, because the stigma of involuntary receiverships on ongoing businesses is not present in the dissolution of this partnership. By applying the stricter standard imposed in ongoing corporation receivership cases to dissolution cases, Superior Court unnecessarily restricted the Chancellor's discretion and improperly intruded upon the proper administrative functions of the Chancellor in fashioning adequate remedies in partnership dissolution cases.

It was within the Chancellor's discretion to appoint a receiver. Our review of that decision, considering all of the facts and circumstances, reveals no abuse of discretion.

Accordingly, the Chancellor's decision is affirmed and we reverse that portion of Superior Court's Opinion and Order that reversed the Chancellor's Order appointing a receiver.

ZAPPALA, J., filed a concurring opinion.

NIX, C.J., did not participate in the consideration or decision of this case.

LARSEN, J., did not participate in the decision of this case.

ZAPPALA, Justice, concurring.

While I concur in the result reached by the majority, I am compelled to write separately to emphasize the reasons for doing so. Our standard of review regarding the determination of the trial court to appoint a receiver is whether or not that court abused its discretion. *Northampton National Bank of Easton v. Piscanio*, 475 Pa. 57, 379 A.2d 870 (1977) and *Lindenfelser v. Lindenfelser*, 396 Pa. 530, 153 A.2d 901 (1959). In *Tate v. Philadelphia Transportation Company*, 410 Pa. 490, 190 A.2d 316 (1963), we held that a receivership is appropriate when gross mismanagement, fraud or similar circumstances exist. It is clear from reviewing the record that sufficient evidence is present to sustain the conclusions of the Chancellor. Accordingly, I find it unnecessary to create any new reasons for the appointment of a receiver when the record is as clear as the one now before this

614

Court. For the foregoing reasons, I find no abuse by the Chancellor in the appointment of a receiver and would therefore reverse the Opinion and Order of the Superior Court and affirm the Chancellor's decision.